UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAYA CAMARA, | No. C-06-7552 EMC |
| Petitioner/Plaintiff, | **ORDER DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT AND GRANTING RESPONDENT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| MICHAEL CHERTOFF, *et al.*, | |
| Respondents/Defendants. | **(Docket Nos. 24, 27)** |

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** Maya Camara's motion for summary judgment and **GRANTS** Respondents' cross-motion for summary judgment.

## I. LEGAL STANDARD

The denial of a naturalization application is reviewed de novo by a district court. Title 8 U.S.C. § 1421(c) provides as follows:

> A person whose application for naturalization under this title is denied, after a hearing before an immigration officer under section 336(a) [8 U.S.C. § 1447(a)], may seek review of such denial before the United States district court or the district in which such person resides in accordance with chapter 7 of title 5, United States Code [5 U.S.C. § 701 *et seq.*]. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

8 U.S.C. § 1421(c).

At issue in this case is whether Ms. Camara's application for naturalization, filed on September 12, 2003, was properly denied. The parties agree that the scope of review of the

agency's action below is *de novo* and that this Court is free to make its own findings of facts and conclusions of law. However, the parties have also stipulated that the record shall be confined to the administrative record. The Court, however, retains the power to take judicial notice and consider properly admissible evidence which is not genuinely in dispute.

Having reviewed the record and the parties' submissions, the Court finds the following facts.

## II. FACTUAL FINDINGS

A. Marriage Contract of November 14, 1991

On November 14, 1991, Ms. Camara and Anthony Dave T. Gonzalez signed a marriage contract in the Philippines. *See* Gurfinkel Decl., Ex. A.[1] In the contract, Ms. Camara and Mr. Gonzalez certified that they were married on that day in the presence of a person solemnizing the marriage and two witnesses. *See id.* In the same contract, the solemnizing officer, a minister, certified that Marriage License No. 9935890, issued on November 8, 1991, "in favor of said parties," was exhibited to him. *Id.* As it turns out, Marriage License No. 9935890 was issued in favor of persons other than Ms. Camara and Mr. Gonzalez. *See id.*, Ex. B.[2]

B. Application for Immigrant Visa

On July 8, 1993, Ms. Camara applied for an immigrant visa to the United States and requested status as the unmarried child of a United States citizen. *See* Resps.' Ex. 1. On the application, Ms. Camara stated, *inter alia*, that she had never been married, did not have any children, and intended to stay in the United States permanently. *See id.* On October 24, 1993, Ms. Camara received the visa she sought, *see* Resps.' Ex. 2, and entered the United States. *See* Gurfinkel Decl., Ex. C.

---

[1] Respondents have asked that Exhibit A be stricken because it is "either not contained in or . . . not the same document[s] as [that] in the administrative record." Opp'n at 4 n.3. The request is denied. As Ms. Camara points out, the marriage contract which is Exhibit A to the Gurfinkel declaration is the same document as DHS0111. *See* Resps.' Ex. 6.

[2] Respondents have asked that Exhibit B be stricken because it is "either not contained in or . . . not the same document[s] as [that] in the administrative record." Opp'n at 4 n.3. The request is denied. Respondents do not challenge the authenticity of the documents contained in Exhibit B and, as discussed below, the exhibit does not actually favor Ms. Camara's position but rather lends support to Respondents' position.

2

C.    Previous Applications for Naturalization

On September 19, 1996, Ms. Camara applied for naturalization. *See* Resps.' Ex. 3. On the application, she said that she was married only one time, that she was currently married to Mr. Gonzalez, and that she had one child, born on May 10, 1991. *See id.* A few months later, Ms. Camara withdrew this application for naturalization. *See* Resps.' Ex. 4.

In 1998, Ms. Camara applied again for naturalization. *See* Resps.' Ex. 5. On the application, she again said that she was married only one time, that she was currently married to Mr. Gonzalez, and that she had one child, born on May 10, 1991. *See id.* In conjunction with this application for naturalization, Ms. Camara was interviewed by the then Immigration and Naturalization Service ("Service")[3] on November 16, 1999. *See id.* During the sworn interview, Ms. Camara did not mention the marriage ceremony on November 14, 1991. Rather, she stated that she had married Mr. Gonzales on April 19, 1995 -- *i.e.*, after her immigration to the United States. *See id.* She also explained that she did not identify her son at the time that she immigrated to the United States because she did not, at that time, plan on staying in the country (she was simply there to take care of her father), *see id.* -- even though in her application for an immigrant visa she had stated that she intended to stay permanently. *See* Resps.' Ex. 1.

Thereafter, the Service initiated an investigation, which revealed the marriage contract of November 14, 1991, between Mr. Gonzalez and Ms. Camara. *See* Resps.' Ex. 6. On January 22, 2001, the Service denied the application for naturalization, stating that,

> [a]t the time you immigrated to the United States as an unmarried daughter of a United States citizen, you were ineligible for such status, as you were in fact married. Inasmuch as you were not lawfully admitted to the United States as a lawful permanent resident, you do not at this time meet the five years continuous residence requirement, and you are ineligible for naturalization.

Resps.' Ex. 7. The Service also stated that, during the November 16, 1999, interview, Ms. Camara had "provided false testimony when you claimed that you were married one time." *Id.* Therefore,

---

[3] Because the proceedings at issue include decisions by the INS and its successor agencies within the Department of Homeland Security, for ease of reference, this order will refer only to the "Service."

3

1  Ms. Camara had failed to establish that she was a person of good moral character, which also made
2  her ineligible for naturalization. *See id.*

D. <u>Decision of Philippines Trial Court Voiding Marriage *Ab Initio*</u>

Subsequently, on July 28, 2003, a trial court in the Philippines issued a decision on a petition filed by Mr. Gonzalez, in which he asked that his marriage to Ms. Camara be declared void *ab initio* for having been celebrated without a valid marriage license in accordance with the Family Code for the Philippines. *See* Gurfinkel Decl., Ex. D at 16. According to the Philippine court's decision, Ms. Camara, while in the United States, called Mr. Gonzalez in 2000 and informed him that their marriage was void for lack of a marriage license. *See id.* at 18. Ms. Camara advised Mr. Gonzalez to file the petition. *See id.* Mr. Gonzalez did so and, although notified, Ms. Camara did not make any responsive pleading or appear. *See id.* at 19.

The Philippine court concluded that Mr. Gonzalez was entitled to the relief for which he prayed, based in large part on papers that had been given to Mr. Gonzalez by Ms. Camara's lawyer. Those papers included a registrar's certification which reflected that "Marriage License No. 9935890 purportedly issued to [Mr. Gonzalez and Ms. Camara on November 8, 1991,] for their wedding was issued in favor of Mr. Rolando Sarenas and Miss Cristina Francisco on November 6, 1991 and . . . no marriage license was issued to Mr. Anthony Dave T. Gonzales [sic] and Miss Maya Camara on November 8, 1991." *Id.* at 18. Under Article 3 of the Family Code, one of the formal requisites of marriage is a valid marriage license. *See id.* Article 4 further provides that the absence of any of the essential or formal requisites shall render the marriage void *ab initio*.[4] *See id.* at 20. The Philippine court concluded that, because Mr. Gonzalez and Ms. Camara's marriage was celebrated without a valid marriage license, it was void *ab initio*. *See id.*

E. <u>Application for Naturalization at Issue</u>

On September 12, 2003, Ms. Camara applied for a third time for naturalization. *See* Resps.' Ex. 8. On the application, Ms. Camara stated that she was married one time, that she was currently

---

[4] The term "*ab initio*" means from the beginning. *See* Black's Law Dictionary 4 (7th ed. 1999).

4

married to Mr. Gonzalez on April 17, 1995, and that she had one child, born on May 10, 1991. *See id.*

On December 20, 2004, the Service interviewed Ms. Camara in conjunction with her application for naturalization. *See* Resps.' Ex. 9. During the sworn interview, Ms. Camara admitted that she had actually been married to Mr. Gonzales twice but that the first marriage in 1991 was invalid because it was a marriage without a marriage license. *See id.* She also stated that, at the time she immigrated, she did not identify her son because, at that time, she only came to take care of her father. *See id.*

On October 20, 2005, the Service issued a decision denying Ms. Camara's application for naturalization. *See* Resps.' Ex. 10. The Service acknowledged the decision of the Philippine court in 2003 but stated that it could not "recognize this nunc pro tunc action." *Id.* According to the Service, the trial court "did not have any knowledge as to the truth or falsity of the evidence being submitted" as Ms. Camara did not make an appearance before that court. *Id.* Moreover, according to the Service, "[e]ven if the marriage is found to be void ab initio, it would only [be] deemed to be void from the date that the Regional Trial Court issued the order nullifying the marriage. As such, you wo[u]ld have been a married daughter to a United States Citizen at the time [of] your entry into the United States in 1993 as the decree was not issued until 2003." *Id.* The Service further stated that, "[r]egardless of what effect the courts might give to a decree of annulmen[t], for immigration purposes, the Service[] is not obliged to give retroactive effect to it so as to cure a violation of law respecting entry into the United States." *Id.* The Service also stated that it was denying the application based on a failure to establish good moral character. According to the Service, "during your interview before an officer of the Immigration and Naturalization Service, on November 16, 1999 [*i.e.*, in conjunction with a prior application], you provided false testimony when you claimed that you were married one time." *Id.* Accordingly, the Service denied Ms. Camara's application for naturalization.

Ms. Camara appealed the decision, *see* Resps.' Ex. 11, but the appeal was denied, largely for the same reasons described above. *See* Resps.' Ex. 12.

## III. LEGAL ANALYSIS

A. Dismissal of Respondent Peter Keisler

As a preliminary matter, the Court addresses Respondents' request that Peter Keisler, the United States Attorney General, be dismissed from the action. *See* Opp'n at 2. Respondents explain that, since March 1, 2003 (*i.e.*, prior to the time Ms. Camara filed the naturalization application at issue), the Department of Homeland Security and its United States Citizenship and Immigration Services have been responsible for adjudication of naturalization applications. *See id.* "Accordingly, the discretion formerly vested in the Attorney General is now vested in the Secretary of Homeland Security." *Id.*

Ms. Camara did not, in her papers, oppose Respondent's request. Moreover, dismissal of Mr. Keisler would not appear in any material way to affect Ms. Camara's lawsuit since she has sued in her complaint not only the Attorney General but also the Secretary of Homeland Security. Accordingly, the Court grants Respondents' request and dismisses Mr. Keisler from the lawsuit.

B. Good Moral Character

Turning to the merits of the case, the basic question is, as noted above, whether Ms. Camara's application for naturalization, filed on September 12, 2003, was properly denied. In their papers, Respondents contend that Ms. Camara's application for naturalization was properly denied because, *inter alia*, she lacked good moral character. Title 8 U.S.C. § 1427(a)(3) provides: "No person, except as otherwise provided in this title, shall be naturalized unless such applicant . . . during all the periods referred to in this subsection [*e.g.*, the five-year period immediately preceding the date of filing of the naturalization application] has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C. § 1427(a)(3). Under § 1101(f)(6), a person lacks "good moral character" if "during the period for which good moral character is required to be established, [he or she] has given false testimony for the purpose of obtaining any benefits under this Act." *Id.* § 1101(f)(6). Notably, the false testimony need not be material. The Supreme Court has stated that

> § 1101(f)(6) does not distinguish between material and immaterial misrepresentations. Literally read, it denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits.

*Kungys v. United States*, 485 U.S. 759, 779-80 (1998). The essential point of this provision is that a person's subjective intent to deceive the federal government in an attempt to obtain an immigration benefit impugns his or her good moral character.

According to Respondents, Ms. Camara lacked good moral character pursuant to §§ 1427(a)(3) and 1101(f)(6) because, within the five-year period preceding the date of filing of her naturalization application, she gave false testimony when she stated, during an interview on November 16, 1999 for naturalization, that (1) she had never filed any type of marriage certificate in the Philippines prior to her entry to the United States; (2) she had never married prior to her immigration to the United States; and (3) she was single at the time of her immigration. Respondents contend that the above testimony was given by Ms. Camara for the purpose of obtaining immigration or naturalization benefits. The Court agrees.

First, there is no dispute that Ms. Camara did sign a marriage contract on November 14, 1991, in which she certified that she was marrying of her own free will and in the presence of a solemnizing officer and two witnesses. That marriage contract was filed. Accordingly, Ms. Camara gave false testimony in stating that she had never filed a marriage certificate prior to her entry to the United States on October 24, 1993. *See* Resps.' Ex. 5. Moreover, this false testimony was clearly given for the purpose of obtaining immigration or naturalization benefits. Ms. Camara's visa, upon which the naturalization application was based, had been issued on the basis that she was an unmarried child of a U.S. citizen. *Cf. Garcia v. INS*, 31 F.3d 441, 444-45 (7th Cir. 1994) (noting that "the petitioner's eligibility for an admission preference depended on her being unmarried" and that the petitioner "was well aware of this fact"; thus, she "had a strong motive not to disclose her

[earlier] civil marriage"). Tellingly, Ms. Camara has failed to provide any explanation as to why she claimed she had never filed a marriage certificate prior to her entry to the United States.[5]

In her brief, Ms. Camara argued that the Court should not deny her application for this false testimony because a court can only uphold agency action on the basis articulated by the agency itself, *see Pacific Coast Fed'n of Fishermen's Ass'ns v. United States Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) (noting that "[i]t is a basic principle of administrative law that the agency must articulate the reason or reasons for its decision" and that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself") (internal quotation marks omitted), and here the Service did not expressly deny her naturalization application for this particular testimony. But at the hearing, counsel for plaintiff conceded that this Court on *de novo* review can make findings on ground which differ from those found by the Service. Even if no such concession was intended, the Court is not persuaded by plaintiff's argument.

To be sure, there appears to be some tension between the principle articulated in *Pacific Coast Federation* and the language of § 1427(c), which provides that judicial review of a denial of a naturalization application is de novo, with a court having the authority to make its own findings of fact and conclusions of law. The *de novo* language in § 1427(c) suggests that judicial review for the denial of a naturalization applications not subject to this particular administrative law constraint,

---

[5] That Ms. Camara had a subjective intent to deceive in order to obtain benefits -- *i.e.*, her false testimony was not just a mistake -- is underscored by her prior conduct during the visa application proceedings. *See Kungys*, 485 U.S. at 806 n.2 (White, J., dissenting) (discussing false testimony by petitioner during naturalization process which demonstrated lack of good character under § 1101(f)(6); noting that "petitioner's false testimony given at the visa application stage is not, standing alone, similarly covered by [§ 1101(f)(6)], [but] it is directly relevant to the 'good moral character' determination" as § 1427(e) provides that a court "'shall not be limited to the petitioner's conduct during the five years preceding the filing of the petition, but may take into consideration . . . the petitioner's conduct and acts at any time prior to that period'"); *United States v. Hovsepian*, 422 F.3d 883, 886 (9th Cir. 2005) (noting that, under § 1427(e), "[c]onduct occurring outside the regulatory period is relevant only insofar as it bears on Appellees' present moral character"); *see also* 8 C.F.R. § 316.10(a)(2) (stating that "[t]he Service is not limited to reviewing the applicant's conduct during the five years immediately preceding the filing of the application, but may take into consideration, as a basis for its determination, the applicant's conduct and acts at any time prior to that period, if the conduct of the applicant during the statutory period does not reflect that there has been reform of character from an earlier period or if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character"). Most notably, in her visa application in 1993, Ms. Camara claimed that she did not have any children. *See* Resps.' Ex. 1. It is undisputed that, in fact, she did have a child at that time and the father of the child was Mr. Gonzalez, the man whom she had married on November 14, 1991, prior to her entry to the United States.

notwithstanding the fact that the statute states that a party may seek review of a denial of a naturalization application in accordance with the Administrative Procedure Act ("APA").  *See* 8 U.S.C. § 1427(c) (referring to "chapter 7 of title 5, United States Code").

Moreover, even if *Pacific Coast Federation* were to control, Ms. Camara fares no better because the Service's reason for denying her naturalization application was broad enough to encompass her false testimony related to the marriage certificate. In particular, in denying Ms. Camara's appeal, the Service stated that she had misrepresented "both [her] marital status and [the fact] that [she] had a child from the marriage" in her application for a visa and then "continued to misrepresent both during [her] second application for naturalization (filed December 9, 1998), which was denied." Resps.' Ex. 12. A misrepresentation regarding marital status fairly includes a misrepresentation regarding the marriage certificate. In short, the Service's stated ground was broad enough to encompass the Court's finding herein.

Second, even if the false testimony regarding the marriage certificate were not sufficient to establish lack of good moral character, the Court finds that Ms. Camara also lacked such character because she gave false testimony when she testified, during the November 16, 1999, interview, that she had never married prior to her immigration to the United States and was single at the time of her immigration. Ms. Camara does not dispute that, at the time of her testimony, she believed that she was married to Mr. Gonzalez on November 14, 1991. Nor does she assert that she had any ground to believe otherwise when she gave her testimony in 1999. Therefore, by claiming that she had never been married prior to her immigration to the United States and was single at the time of her immigration, she knowingly gave deceptive testimony. As above, this testimony was clearly given for the purpose of obtaining immigration or naturalization benefits as Ms. Camara's visa was issued on the basis of her being an unmarried child of a U.S. citizen.

In response, Ms. Camara contends that her subjective belief and intent to deceive are not relevant: "The issue is not what [she] *believed*, but rather the issue is whether or not she was *legally single* at the time of her entry. . . . Since Ms. Camara's marriage was not valid (or was void) under Philippine law, she was *lawfully single* at the time of entry." Reply at 7 (emphasis in original). There are several problems with this argument.

9

1    First, Supreme Court case law has made clear that an applicant's subjective belief is relevant for purposes of § 1101(f)(6). As noted above, in *Kungys*, the Supreme Court stated that false testimony need not be material before a person can be deemed to be lacking in good moral character.

> The absence of a materiality requirement in § 1101(f)(6) can be explained by the fact that its primary purpose is not . . . to prevent false pertinent data from being introduced into the naturalization process (and to correct the result of the proceedings where that has occurred), but to identify lack of good moral character. The latter appears to some degree *whenever there is a subjective intent to deceive*, no matter how immaterial the deception.

*Kungys*, 485 U.S. 759 at 780 (emphasis added). As discussed above here, there is little question that Ms. Camara did have a subjective intent to deceive in order to obtain immigration or naturalization benefits when she testified that she had never been married prior to her immigration to the United States and was single at the time of her immigration. Her "subjective intent to deceive" goes directly to the criteria at issue -- her moral character. The fact that it later turns out that there were technical problems that could have voided the marriage does not negate her impugned character at the time of her testimony in 1999.

Second, as discussed below in the eyes of federal immigration law in the naturalization context, Ms. Camara was not in fact single when she testified in 1999, prior to the 2003 judgment of the Philippine court.

The Court therefore finds that Ms. Camara did falsely testify at the November 16, 1999, interview in conjunction with the prior naturalization application when she stated that (1) she had never filed any type of marriage certificate in the Philippines prior to her entry to the United States; (2) she had never married prior to her immigration to the United States; and (3) she was single at the time of her immigration. The Court further finds that Ms. Camara gave this false testimony in order to obtain immigration or naturalization benefits and therefore lacked good character pursuant to §§ 1427(c) and 1101(f)(6). Accordingly, the denial of Ms. Camara's application for naturalization was proper.

C.   <u>Lawful Entry</u>

Although the Court denies Ms. Camara's naturalization application for the reasons stated above, there is a separate and independent reason justifying denial. An alien who is excludable at

entry does not acquire lawful status. *See Monet v. INS*, 791 F.2d 752, 753 (9th Cir. 1986) (taking note that, in a previous opinion, the Ninth Circuit approved "the BIA's ruling that aliens' admissions on visas to which they were not entitled conferred no lawful status on the aliens for purposes of obtaining relief from deportation"). Ms. Camara's entry to the United States was not lawful because she was admitted as an unmarried daughter of a U.S. citizen when in fact she was actually married.

Ms. Camara argues that she was "legally single" at the time of entry under Philippine law. According to Ms. Camara, she was legally single at the time of entry because, under Philippine law, her marriage was void *ab initio* for failure to have a valid marriage license: "Even if there never had been an annulment of [her] purported 1991 'marriage' [by the Philippine court], her marriage would still have never legally occurred, as the annulment merely declared the existing fact that the marriage was invalid or void from the beginning." Mot. at 13. The problem with this argument is that, although Ms. Camara argues that there was no need for the Philippine court to declare the marriage a nullity, the Philippine court never indicated that its ruling was unnecessary. Moreover, Ms. Camara cites only California, and not Philippine, authority for the proposition that "an annulment is a mere formality that 'merely declares an existing fact -- viz., that the marriage is void -- and this fact may be shown [in any proceeding in which the fact of marriage may be material] even though it may not have been so adjudicated.'" *Id.* at 13 n.4 (asserting that (quoting *Estate of Gregorson*, 160 Cal. 21, 25 (1911)). A judgment was required to nullify Ms. Camara's marriage. That a judgment is necessary is evidenced by the fact that Article 4 of the Philippine Family Code provides that technical deficiency does not invalidate the marriage. Arguably, all formalities were met here; a license was presented and reviewed by the wedding official. The problem is that the license number recited in the certificate reflects a certificate which was issued to another couple. Whether this problem entirely nullifies the marriage or is a mere technical deficiency is one that requires adjudication.

Ms. Camara argues in the alternative that the Court should give retroactive effect to the Philippine court's finding that her marriage was void *ab initio*. However, under governing Ninth Circuit law, Ms. Camara has failed to establish that a relation back is appropriate. *See generally Hendrix v. United States INS*, 583 F.2d 1102 (9th Cir. 1978).

11

In *Hendrix*, the petitioner was a native of the Philippines who had entered the United States with an immigrant visa for an unmarried child of a United States citizen. *See id.* at 1103. In fact, the petitioner had been married to a Philippine citizen at the time of her entry. *See id.* An immigration judge therefore found her deportable. *See id.* The petitioner appealed the decision and, while the appeal was pending with the Board of Immigration Appeals, she managed to have her marriage annulled by a California court. *See id.* The state court found that her consent to the marriage was obtained by force[6] and that the annulment should be given retroactive effect voiding the marriage *ab initio*. *See Hendrix*, 583 F.2d at 1103. Thereafter, on her appeal to the Board, the petitioner argued that, in light of the annulment by the California court, she was not married at the time of her entry and was properly admitted under her visa. The Board rejected the argument, after which the petitioner sought review with the Ninth Circuit. The Ninth Circuit upheld the Board decision, stating that, "[u]nless unusual circumstances dictate that in the interest of justice retroactive effect should be given to an annulment, it is the marital status at the time of entry that should serve as the basis for one alien's preferment over others under the quota system. At the time petitioner entered the United States she was not an unmarried person." *Id.*

Importantly, the presumption against affording retroactive effect to the annulment obtained even though the state court in *Hendrix* found the marriage void *ab initio*. Accordingly the standard established in *Hendrix* applies with equal effect to the case at bar. In the instant case, Ms. Camara has failed to establish any unusual circumstance which would dictate that, in the interest of justice, retroactive effect should be given to the Philippine court's annulment. She fails to overcome *Hendrix's* presumption against retroactivity.

Ms. Camara argues still that *Hendrix* is distinguishable because there the petitioner argued that the marriage was invalid as it was obtained by force, "a subjective ground." Mot. at 14. In contrast, her marriage was void based on a lack of a marriage license, "an objective ground." *Id.* at 15.

---

[6] *See* Cal. Civ. Code § 4425(e) (repealed in 1994) ("A marriage is voidable and may be adjudged a nullity if . . . [t]he consent of either party was obtained by force, unless such party afterwards freely cohabited with the other as husband or wife."); *see also McDonald v. McDonald*, 6 Cal. 2d 457, 461 (1936) ("'[T]he decree of nullity . . . determines that no valid marriage ever existed.'").

> We fully agree with the USCIS that *subjective* grounds for annulment, such as force, fraud, mistake, etc., depend on the person's *subjective state of mind*, and could be used to "manipulate" immigration laws (as it is difficult to establish the veracity of a person's *subjective* state of mind). However, marriages performed without a license, or where the solemnizing officer lacks authority to perform the wedding, incestuous marriages, etc. *involve objective factors*, which are incapable of being manipulated. *Hendrix* involved *subjective* grounds for annulment (i.e., force, which is merely *voidable* [under California law], where Ms. Camara's marriage is based on *objective* grounds (no license, and is *void ab initio*).

*Id.* (emphasis in original).

To be sure, a subjective ground for annulment may be more subject to manipulation than an objective ground. But this distinction is not dispositive. Whether the ground for an annulment is characterized as subjective or objective, the question is whether there is a danger of manipulation of immigration criteria against which the *Hendrix* presumption is designed to protect. *See Matter of Astorga*, 17 I. & N. Dec. 1, 4 (BIA 1979). In the instant case, although the existence of a license is an objective fact, there is a risk that the legal process is subject to manipulation. First, although the Philippine court did annul Ms. Camara's marriage to Mr. Gonzalez, it is significant that, during those proceedings, there was no party with any real incentive to challenge the evidence submitted by Mr. Gonzalez (which he received from Ms. Camara's lawyer) indicating that there was no valid marriage license. Notably, the Philippine court even recognized the possibility of a collusive suit between Mr. Gonzalez and Ms. Camara. *See* Pet.'s Ex. D. Second, although the registrar's certification provided by Ms. Camara states that "[n]o Marriage License appear[s] to have been issued to MR. ANTHONY DAVE T. GONZALEZ and MISS MAYA CAMARA on November 8, 1991," Pet.'s Ex. B, there is no documentation supporting this claim. That is, there is no documentation showing what marriage licenses were issued on November 8, 1991. Rather, the documentation attached to the registrar's certification simply reflects that Mr. Sarenos applied for a marriage license on October 25, 1991, and that Marriage License No. 9935890 was issued to Ms. Francisco on November 6, 1991. *See id.* There is no documentary proof that no marriage license was issued to Ms. Camara on November 8, 1991.

Moreover, it seems highly implausible that the parties would have engaged in a formal wedding ceremony and that the minister, the solemnizing official, would have attested that he

13

reviewed the marriage license if none had ever been issued to Ms. Camara and Mr. Gonzalez. Plaintiff has offered no explanation how she could have obtained a wrong marriage license, nor how neither she, Mr. Gonzalez, nor the officiating minister failed to notice it was not in her and Mr. Gonzalez's names. Nor does she state that neither she nor Mr. Gonzalez ever applied for a license. Nor does she describe any effort to determine whether the marriage certificate simply recited the wrong license number (which did not jibe with the date of issuance). These facts underscore the apparent inadequacy of the process of the annulment lawsuit before the Philippine court, and the risk of manipulation when there is no true adversarial process.

Because of the risk of manipulation and because there are no unusual circumstances demonstrating why the Philippine court's annulment should be given retroactive effect, the Court concludes that *Hendrix* controls, and thus for purposes of this naturalization proceeding, Ms. Camara did not lawfully enter the United States as an unmarried child of a U.S. citizen. Therefore, her naturalization application was properly denied.

## IV.   CONCLUSION

For the foregoing reasons, Ms. Camara's motion for summary judgment is denied and Respondents' cross-motion for summary judgment granted. This order disposes of Docket Nos. 24 and 27.

The Clerk of the Court is directed to close the file in this case and enter judgment in favor of Respondents.

IT IS SO ORDERED.

Dated: January 7, 2008

_____
EDWARD M. CHEN
United States Magistrate Judge

14